BEN FISHER v. MRS. M. E. BARBER ET AL.

Decided June 28, 1910.

**1.—Breach of Promise to Marry—Release—Evidence.**

In an action for damages for breach of promise to marry, evidence considered and held sufficient to show a breach of such promise, and not sufficient to raise the issue of a release by plaintiff or of a cancellation of the contract by mutual agreement.

**2.—Same—Release of Damages—No Consideration.**

A release of a claim for damages by reason of a breach of promise to marry is not binding unless made upon sufficient consideration. Evidence considered and held to show no consideration.

**3.—Same—Damages—Evidence.**

In actions for breach of promise to marry, it is proper for the jury to consider the pecuniary as well as the social standing of the defendant as tending to show the condition in life which the plaintiff would have enjoyed by the marriage. Hence evidence as to the financial condition of the defendant is proper.

**4.—Same—Verdict not Excessive.**

Evidence considered and held sufficient to warrant a verdict for $3,500 as damages for breach of promise to marry.

**5.—Same—Subsequent Marriage—Effect.**

The fact that a plaintiff in a suit for damages for breach of promise to marry has succeeded in procuring another husband, does not compensate her for the injury done her by the defendant, and can not avail him as a satisfaction and discharge of said damages.

**6.—Same—Objection by Children no Defense.**

In the absence of a claim for exemplary damages, evidence to the effect that defendant's daughters told him before he broke his engagement with plaintiff, that they would leave his house and never live with him again if

he married the plaintiff is properly excluded. Such evidence is no defense to an action.for actual damages.

**7.—Trial—Harmless Error.**

An error on the part of the court in overruling an objection to a question seeking to elicit improper testimony becomes harmless when the witness answers that he does not know of the fact inquired about.

**8.—Breach of Promise—Damages—Charge.**

In a suit for damages for breach of promise to marry, charge considered and held not subject to the objection that it permitted double recovery for the same injury. Some credit must be given a jury for reasonable intelligence.

Appeal from the District Court of Chambers County. Tried below before Hon. L. B. Hightower.

*Marshall & Marshall* and *Davis & McMurray,* for appellant.—The verdict of the jury and the judgment of court is not supported by the evidence, in this, that the evidence of Mrs. Gill, the plaintiff, shows that since the alleged breach she had married, and is now the recipient of all the benefits and advantages of connubial existence to as full an extent as she ever contemplated to enjoy by a matrimonial alliance with defendant. The evidence further demonstrates she is in more advantageous circumstances than she could have realized from a marriage with defendant, in that she contemplated displaying, at least, and probably exercising, a mother's care and solicitude for Fisher's children, had she married him.

The marriage she has consummated does not require her to look after her husband's children, who are all grown and away from her husband's home. Moreover, her feelings and affections could not have been greatly lacerated, for Fisher called upon her only once or twice before he proposed marriage, as she claims, and her chief aim was not regard and affection for Fisher, but worldly considerations.

The evidence is insufficient to support the verdict, because it is shown that no particular time was set for the alleged marriage, and that defendant did not actually refuse to comply with the alleged promise, but merely requested plaintiff to release him, and believed that plaintiff had done so. It was necessary for plaintiff to have made an offer of willingness to marry defendant before suit was brought and before a cause of action could arise. Burnham v. Cornwell, 63 Am. Dec., 529; Weaver v. Bachert, 2 Pa. St., 80; Graham v. Martin, 64 Ind., 567; Fidler v. McKinley, 21 Ill., 308; Fible v. Caplinger, 13 B. Monroe (Ky.), 464; 5 Enc. Law & Proc., 1005; 4 Am. & Eng. Ency. Law, 890.

The question of plaintiff's readiness and willingness is one for the jury. McCormich v. Robb, 24 Pa. St., 44; Graham v. Martin, 64 Ind., 567.

In an action for breach of promise of marriage it may be shown that the defendant's refusal to fulfill his promise was because of family opposition, and she agreed to said opposition. McKee v. Nelson, 15 Am. Dec., 384; Johnson v. Jenkins, 24 N. Y., 252; Irving v. Greenwood,

1 Carrington & Payne (Eng.), 350; 4 Am. & Eng. Ency. Law, 900; Kaufman v. Fye, 99 Tenn., 145; Sutherland on Damages, secs. 159 and 983.

When sued for damages for breach of promise, the defendant may show in defense that the contract was rescinded by mutual agreement. Ortiz v. Navarro, 10 Texas Civ. App., 195; King v. Gillett, 7 M. & W. (Eng.), 55; Shellenbarger v. Blake, 67 Ind., 75; Mabin v. Webster, 129 Ind., 430; Grant v. Willey, 101 Mass., 356; Snell v. Bray, 56 Wis., 156; 8 Am. & Eng. Ency. Law, 894; 5 Cyc. Law & Proc., 1002.

*B. F. Louis,* for appellees.

PLEASANTS, CHIEF JUSTICE.—This suit was brought by appellee, Mrs. M. E. Barber, against appellant, to recover damages for the alleged breach by appellant of a promise to marry said appellee. Plaintiff's original petition, which was filed on February 19, 1906, alleges in substance, "that she was unmarried and that on the 17th of December, 1905, the defendant, who was likewise unmarried, entered into an agreement to marry the plaintiff in the month of January, 1906, as soon as she could get ready; that on or about the 29th of December, 1905, the defendant broke his contract and refused and declined to marry the plaintiff, and so advised her; that at that time she was proceeding with her preparations for her marriage and would have been ready and willing to carry out her agreement during said month of January; that she was a widow and in destitute financial circumstances, the mother of five children, of whom the oldest was twelve years of age, and that she was forced to do manual labor to provide herself and children with the necessities of life; that the defendant had known the plaintiff a long time; knew her circumstances and, being a man of large wealth, as an inducement to obtain her consent to marry him, promised to provide her and her children with a good home, necessities and comforts of life, and to educate her children; that the defendant maintained a high social position and one of influence and power in the community in which he lived, was held in esteem and favor, and so known to her at the time of her marriage engagement. That defendant had made it known to different persons that he greatly loved her, desired to marry her, and that this, as well as his subsequent breach, was generally known in the community. That she was a woman of highly sensitive nature and was held in the highest respect and regard by all who knew her; and that by reason of the failure of the defendant to carry out his promise of marriage, she· was greatly humiliated and caused to suffer shame, and her spirits and pride were wounded and she was subjected to ridicule, taunts and derision, and occasioned great mental distress, pain and anguish, and sustained the loss of the advantageous matrimonial connection with defendant, to her damage in the sum of fifteen thousand dollars.

On March 15, 1909, about three years later, plaintiff filed her first

amended original petition, upon which she went to trial, which contained substantially the same allegations as the original petition, with the exception that she was joined therein by her husband, E. P. Gill, whom she alleged she had married on the 16th of October, 1907. She further alleged that her present husband was a poor man without property or wealth, and unable to support her and her children as well as the defendant could have done by reason of his financial means and wealth, and that he would be unable so to do during his life.

The third amended original answer, upon which trial was had, was filed on March 14, 1906, and, in addition to a general denial, set up a mutual cancellation and release of the promise and agreement to marry, alleging that this release and cancellation of the contract was due to the fact that the defendant learned that the marriage was objectionable to his children, and that having told this to the plaintiff, she agreed that it was best for them not to contract marriage. Defendant further alleged that the marriage would have been unprofitable and unhappy and a divorce or separation would have been the result.

The plaintiff filed her third supplemental petition on March 18, 1907, expressly abandoning preceding supplemental petitions, and among other exceptions this petition contained one to all that portion of the defendant's second amended original answer which undertook to set up the fact that the defendant learned that the marriage with the plaintiff would be highly objectionable to his children, the ground of said exception being that the evidence of the reason of defendant's breach of his contract would be wholly immaterial and irrelevant to any issue, and that as no exemplary damages were alleged, such evidence of objections of the children would not be admissible to reduce the actual damages or upon any issue in the case. This exception was sustained in part, so far as the same excepted to the objections of such children as a defense, but the exception was overruled in so far as the facts therein excepted to should go to establish the release or rescission of the contract.

In her third supplemental petition, the plaintiff also excepted to the allegations that if the marriage had been consummated it would have been unprofitable and unhappy, and a divorce or separation would have been the result, because they were only conclusions and speculation and would constitute no defense, and this exception was sustained by the court, except in so far as it might go to establish the release or rescission.

The trial with a jury in the court below resulted in a verdict and judgment in favor of plaintiff for the sum of $3500.

Plaintiff testified that she had known defendant for about thirteen years and that on December 17, 1905, she accepted defendant's offer of marriage, which he had repeatedly theretofore made to her. After engaging herself to defendant she commenced preparations for her marriage and ordered her wedding clothes. She told him that she would be ready to marry him during the month of January, 1906. She also told her friends and relatives about her engagement. The defendant thereafter continued to visit her and brought presents to her and her

children. On December 29, 1905, he came to see her and urged her to get ready for marriage as soon as possible. Two days later he sent his nephew, Mr. Epperson, to her with the message that he would have to "break up." She told Epperson to tell defendant to come to see her, and he came that night and told her that on account of the opposition of his children he would have to "break up" with her. "It was generally known throughout Barber's Hill and Mont Belvieu and the community that they were engaged to be married. Several of them asked her about it. She went ahead and got ready, got money from her father to get the clothes she needed, and got her wedding clothes from Chicago. She had numerous conversations with the defendant after promising to marry him, and he always insisted on her hurrying up. When the defendant told her he would have to break up, she felt like she did not know what to do, was shocked, could not realize it was so. She cried. When he left she was crying. It seemed as if she could not stand it at all; that she was about half crazy; could not eat anything; was affected in her mind so that she did not seem to have good sense for a while. She could not get over it as long as she stayed on the Hill, which was six or seven months. After she left there she seemed not to study about it quite so much, as she was busy. She was affected still at the time of the trial (March, 1909) and still studied about it. It has been a source of humiliation to her. She knew every one was talking about it and she thought people were laughing about it. She has not gotten over it entirely and still continues, and though she is married, she feels just the same. It affected her health, her weight and appetite. She did not care for anything much, never wanted to do anything; she was not satisfied or contented. The people joked her about the way she was treated and it made her feel bad, made her feel ashamed. She knew the defendant was reputed to be wealthy, and thought it was about $30,000. He had lands, cattle, sheep, money and was getting money for oil leases; had a home, horses and carriages. Her brother married in February, 1907, and her only source of assistance was cut off. She took in washing and raised vegetables to support herself and family. Took in washing from people living at Cedar Bayou. This was after she left Barber's Hill. She did not make enough to clothe herself and children, and had to sell a few cattle for this purpose. She lived at Cedar Bayou until October, 1907, when she married. Her husband is not a wealthy man, runs a livery stable in Dayton, and makes a plain living. The defendant was known to be a good man, and so considered in the community in which he lived, and in which he stood well."

"She had regard for him; thought he was a good man and kind, and had considered before she promised to marry him whether or not she could be happy with him, and reached the conclusion that she would; her present husband keeps no carriage for private use, but rents them. Mr. Fisher had carriages and teams for his own private use and not for hire. When she stated on direct examination that his reputation in the community as being a man of $30,000, she meant that that was his

part of the land. She had heard most everyone say that Fisher was pretty well fixed and had money and property. She did not consider it a business proposition entirely, but of course she had to look after her children, and tried to better her condition. She did not think she would be unhappy with Mr. Fisher. He had five children, two of them grown, one married and one twenty years of age, boy and two girls, one about fifteen and the other about thirteen, and a little boy about ten."

Defendant admitted that he requested plaintiff to marry him and that she accepted his proposal on December 17, 1905, and that on December 29th he sent her word by Epperson that he would have to withdraw his offer on account of the opposition of his children, and that in response to plaintiff's request, communicated to him by Epperson, he went to see her that night and told her of the opposition of his children to his marriage, and that on that account he could not marry her. He says when he told her this she replied that she was sorry, and it was what she expected, and that he does not know that she said anything else at that time, but he thought the matter was settled.

Epperson testified that when he delivered defendant's message to plaintiff she replied: "All right. Just as I expected." That there was some other conversation between him and plaintiff, but he does not remember just what it was, except that he told her that on account of the children raising so much trouble about the marriage that there would be a terrible hereafter and that defendant's children would not get along with hers, and that when he left her she asked him to tell defendant to come to see her that evening that she wanted to talk to him.

We agree with the learned trial judge in his conclusion that this evidence showed a breach by the defendant of his promise to marry the plaintiff and that the issue of a release by plaintiff or of a cancellation of the contract by mutual agreement is not raised. The defendant did not ask plaintiff to agree to a cancellation of the contract. He sent Epperson to her, not to obtain her consent to his abandonment of his contract, but to inform her that he had determined not to marry her and to tell her why he could not carry out his agreement with her. When she received this information she was not required, in order to preserve her rights under the contract, to insist on its performance by the defendant and again express willingness to perform her part of it. Her statement to Epperson that "it is all right," and that "she expected it," not having been made in response to any request by the defendant for a cancellation of the contract can not be treated as an agreement on her part that the contract should be cancelled. The undisputed evidence shows that defendant had determined to abandon his contract before he sent Epperson to the plaintiff and that Epperson's mission was to announce that fact to plaintiff, and he was not authorized by defendant to do more than explain to plaintiff the motive which impelled defendant to refuse to carry out his contract. It can not be expected that a woman, upon the receipt of a message of this kind, would not attempt to hide from the messenger her feelings of regret and humiliation, or

that she would insist upon defendant's carrying out his contract with her; and plaintiff's statement to Epperson before set out can only be regarded as expressions made for the purpose of hiding her feelings of wounded pride. Ortiz v. Navarro, 10 Texas Civ. App., 195 (30 S. W., 583); Knoxberger v. Roiter, 3 S. W., 872.

There is no intimation in any of the testimony that if she had pleaded with defendant to reconsider his determination to abandon her that he would not have refused to marry her. On the contrary, he had ample opportunity to reconsider and to offer to perform his contract after he knew that she was not willing to release him, and yet he made no such offer.

It is also clear that nothing said by plaintiff to Epperson or to the defendant could be given the effect of a release by her of the damages caused her by defendant's breach of his contract. If the statements made by her, or her conduct on the occasions mentioned, could be construed as evidencing an intention on her part to release her claim for damages, such release could not be held binding because it was wholly without consideration.

The evidence as to the defendant's financial condition was admissible on the issue of the amount of actual damages sustained by plaintiff.

In the Ortiz case, *supra*, the court says: "In actions of this character, it is proper for the jury to consider the pecuniary as well as the social standing of the defendant as tending to show the condition of life which the plaintiff would have received by the marriage."

The loss of the money value of the proposed marriage and the comforts and advantages which would accrue to a woman in straitened circumstances by becoming the wife of a man of means, is so obviously a proper element of damages for a breach of a contract of this kind, that it is hardly necessary to cite authorities in support of the proposition that proof of such loss is admissible. The rule is sustained by all the authorities. 3 Sutherland on Damages, sec. 989; Glasscock v. Shell, 57 Texas, 223; Daggett v. Wallace, 75 Texas, 352.

The evidence shows that the defendant had a good house provided with many comforts and conveniences and that he was possessed of from $25,000 to $50,000 in property and money, and his income was sufficient to enable him to provide well for his family and he was liberal in providing for their support and maintenance. Plaintiff was greatly distressed and disappointed by his failure to marry her and suffered much shame and humiliation because of his treatment of her which was generally known in the community in which they lived. Upon this evidence we can not say that the verdict of the jury was excessive.

There is no merit in appellant's contention that because of the fact that plaintiff has succeeded in procuring a husband that she is only entitled to recover nominal damages for defendant's breach of his contract to marry her. It may be that her present and future life is and will be as happy, or more so, than it would have been if she had married the defendant; but granting that such is the case, this does not com-

pensate her for the injury done her by the defendant and can not avail
him as a satisfaction and discharge of the damages caused plaintiff
by his wrongful act.

There was no error in the refusal of the court to permit the defend-
ant to introduce in evidence the testimony of two of his daughters to
the effect that they informed defendant before he broke his engagement
with plaintiff that if he married plaintiff they would leave defendant's
home and would not live with him thereafter. This testimony would
be admissible in mitigation of damages if plaintiff was claiming ex-
emplary damages, but her claim being only for actual damages the mo-
tive which actuated defendant in breaching his contract is immaterial.
The fact that defendant's children objected to his marriage and that
this was the reason given by him for breaking his engagement with the
plaintiff was admitted in evidence as a circumstance tending to support
defendant's plea that plaintiff agreed to a rescission of the contract, but
the testimony as a whole being insufficient to establish such plea, the
jury were properly instructed not to consider for any purpose the testi-
mony as to the objections made by defendant's children to his mar-
riage. Johnson v. Jenkins, 25 N. Y., 252; Smith v. Compton, 58 L.
R. A., 483; Sedgwick on Damages, 8th ed., sec. 641.

The defendant, while on the stand, testifying in his own behalf, hav-
ing stated that when he went up to see plaintiff and told her about the
children and that he could not marry her on account of the children,
that plaintiff said that she expected that about the children, was asked:
"Did she say anything at all about it being best to let it go?" Plaintiff
objected to this question because it was leading, and the court held that
it was, but the witness answered: "When I told her that I could not
marry her on account of the children she said she was sorry of it. Well,
I do not know anything else she said at that time." He was then asked:
"Did she say anything about thinking it best?" Plaintiff objected to
this and the court sustained the objection, but the witness answered:
"As to what she said, if anything, I thought it was done with; that was
my understanding of it." After several other leading questions were
propounded to the defendant in an effort to induce him to state whether
or not plaintiff made the statements to him indicated in the questions
above set out, to each of which questions defendant answered, in sub-
stance, that what plaintiff said was that she was sorry, and it was what
she expected in regard to the children, defendant's counsel asked this
question: "Did she tell you on the occasion when you went to see her
to withdraw the proposition of marriage, that she thought it best under
the circumstances to let the marriage go?" Plaintiff objected to this
question on the ground that it was leading, and the court again sustained
the objection. If defendant had been allowed to answer the question
such answer would have been: "Yes, sir. She made such statement
to me."

The court did not err in sustaining plaintiff's objection. The de-
fendant had been given every opportunity to repeat the statements made

by the plaintiff on the occasion in question, and in reply to previous leading questions by his counsel, had undertaken to state what the plaintiff said. There is nothing to indicate that defendant was so dull as to justify or excuse any further violations of the rule against leading questions than was permitted by the court. It certainly can not be held that the trial judge abused his discretion in calling a halt in this manner of examining the witness.

The defendant on cross-examination was questioned by the plaintiff's counsel in regard to the amount of property and money possessed by him, and his answers disclosed that, among other credits, he had over $9000 in the bank of T. W. House at the time said bank failed and its assets were placed in the hands of a trustee in bankruptcy, and that he had received thirty per cent. dividend on his claim against said bank. He was then asked if he expected to get any more money on this claim, and whether or not the bankruptcy proceedings were closed, to both of which questions he answered that he did not know. These questions and answers were objected to by the defendant on the ground that the records were the best evidence of whether the estate had been closed and that the testimony sought to be obtained by said questions was secondary, irrelevant and immaterial.

We are not prepared to say that the fact of whether the bankruptcy proceedings were closed could not have been shown otherwise than by the record in said proceedings; but be this as it may, the witness having answered that he did not know, the rule against secondary evidence was not violated. We fail to see the materiality of the other question objected to, but the answer of the witness that he did not know could not possibly have prejudiced or injured defendant's case, and if the court erred in not sustaining defendant's objection, such error was harmless.

In instructing the jury upon the question of what plaintiff was entitled to recover, the court told them they might consider "whatever humiliation and shame and wounds to her spirits and pride and mental distress and anguish she may have suffered by reason of the refusal of the defendant to fulfill his promise to marry her."

This charge is objected to on the ground that it permits the recovery of double damages in that it authorizes the jury to include in their verdict separate and distinct items of damages for injuries which, though designated differently, are in fact one and the same injury. It seems clear that "humiliation" and "wounds to the spirit and pride" are one and the same thing, and "humiliation" and "mental distress and anguish" may be one and the same thing. But, conceding that the charge is subject to this criticism, we can not believe that the jury by this tautology in the charge could have understood that they were authorized to allow plaintiff one amount for "humiliation and shame" and another for "wounds to her spirits and pride," and still another for "mental distress and anguish," especially when they were further instructed by the court that they should allow plaintiff such sum as in their judgment would fairly compensate her for the loss and injury.

The following quotation from the opinion of Mr. Justice Williams of this court in the case of Knittel v. Schmidt, 16 Texas Civ. App., 10 (40 S. W., 509), is a forcible expression of what we think is the only reasonable rule to be followed in considering the effect of a charge of this kind:

"We do not think the charge in mentioning as it does the lost time and diminished capacity to labor directs a double recovery. It first tells the jury that they will allow such damages as seem right and proper under all the circumstances. It is hardly to be supposed that a jury of the commonest intelligence would conceive it to be right and proper to allow compensation twice for the same loss. On such questions as this, it is fair to allow something for the intelligence of the jurors and to assume· that common sense would save them from the commission of such an error, unless the court, by its charge, should mislead them."

While we have not set out or discussed in detail the several assignments of error presented in appellant's brief, all of them have received our consideration and in our opinion none presents any error which requires a reversal of the judgment of the court below.

We think the judgment should be affirmed and it has been so ordered.

*Affirmed.*

Writ of error refused.